**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------- x
In re:                                                    : Chapter 11
                                                          :
PENNSYLVANIA REAL ESTATE INVESTMENT : Case No. 20-_____ (___)
TRUST, *et al.*,[1]                                       :
                                                          : (Joint Administration Requested)
       Debtors.                                          :
-------------------------------------------------------------- x

**DECLARATION OF MARIO C. VENTRESCA, JR.,**
**IN SUPPORT OF FIRST DAY PLEADINGS**

     I, Mario C. Ventresca, Jr., hereby declare (this "Declaration") under penalty of perjury

that the following is true to the best of my knowledge, information and belief:

     1.     I am the Chief Financial Officer ("CFO") of Pennsylvania Real Estate Investment

Trust ("PREIT") and each of the debtors as debtors in possession (collectively, the "Debtors"

and, together with their non-debtor subsidiaries, the "PREIT Group" or the "Company") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"). I joined the Company in 1994 and,

prior to serving as CFO, I served as Executive Vice President of Operations. I have served as

CFO of PREIT since January 1, 2020. In this capacity as well as on account of my prior role

with PREIT, I am familiar with the Company's business, financial affairs, day-to-day operations

and restructuring initiatives.

     2.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition (collectively, the "Petitions") in the United States Bankruptcy Court for the District of

Delaware (this "Court") for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").

---

[1]      A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Schedule 1**. The corporate headquarters and the mailing address for the Debtors is 2005 Market Street, Suite 1000, Philadelphia, PA 19103.

3.      I submit this Declaration to provide an overview of the Debtors' business and these Chapter 11 Cases and to support the Debtors' applications and motions for "first day" relief, each of which is listed on the attached **Exhibit A** (collectively, the "First Day Pleadings").

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and other employees, as well as the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.      To familiarize the Court with the Debtors and the relief that the Debtors seek early in these Chapter 11 Cases, this Declaration is organized in four parts.  **Part I** provides an introduction to the Debtors and detailed information on their corporate history and business operations.  **Part II** describes the Debtors' prepetition organizational and capital structures.  **Part III** describes the events that led to the commencement of these Chapter 11 Cases and the Company's prepetition restructuring efforts, including the negotiation and formulation of the Plan and Disclosure Statement, filed contemporaneously herewith.  **Part IV** briefly addresses the First Day Pleadings, and incorporates the facts set forth in each of the First Day Pleadings, as if fully set forth in this Declaration.

### Brief Introduction[2]

6.      PREIT is a leading publicly traded real estate investment trust, or "REIT," specializing in the ownership and management of differentiated shopping malls.  Headquartered

---

[2]      Capitalized terms used in this Introduction but not defined shall have the meanings ascribed to them in the remainder of this Declaration.

in Philadelphia, Pennsylvania, the Company owns and operates more than 20 million square feet of retail space in the eastern half of the United States, with a concentration in the Mid-Atlantic region.

7.      The Company's 60-year history has been marked by steady and capable leadership, which, in turn, has consistently enabled PREIT to deliver value for its stakeholders. In fact, Joseph F. Coradino, who took on the CEO role in 2012, is only the third CEO in the Company's storied history, following in the footsteps of the Company's founder, Sylvan M. Cohen, who was succeeded by Ronald Rubin in 1997, after the Company merged with The Rubin Organization.

8.      During this time, the Company has continued to lead by example, guided by an emphasis on balance-sheet strength, high-quality merchandising and disciplined capital expenditures.  These initiatives continued into the year 2020 with no exception.  But faced with a once-in-a-century global pandemic, which resulted in acute and devastating impacts on many of the Company's mall tenants and retail customers, the Company was forced to quickly address the trickle-up effect of its tenants' distress.

9.      In light of the resulting economic crisis brought about by the public health crisis, the Company's leadership immediately and proactively engaged with its key stakeholders to negotiate a global resolution that would account for the Company's new and unanticipated financial constraints, in a manner designed to provide much-needed liquidity to allow the Company additional time to navigate the uncertain months ahead.  Following extensive prepetition negotiations with its lenders, the Debtors obtained nearly unanimous lender consent on a restructuring support agreement (as such document was amended, supplemented or modified from time to time, the "Restructuring Support Agreement") that addresses the

Company's financial burdens and the realities of the present environment. In order to consummate the restructuring outside of a court process, the Debtors required 100% lender consent. As further described below, despite weeks of round-the-clock efforts to effectuate the restructuring on an out-of-court basis, one lone hold-out lender—who purchased a 5% interest in the debt only weeks ago at a significant discount—has refused to agree to the restructuring, signaling instead an attempt to contest the confirmation of the Debtors' Plan.

10.     Nonetheless, with the consent of the overwhelming majority of their lenders, the Debtors, with the assistance of their advisors, have obtained broad consensus among the lender group to a prepackaged chapter 11, which does not impair the claims or interests of all other stakeholders. Indeed, the Debtors' plan (the "Plan") and disclosure statement (the "Disclosure Statement"), filed contemporaneously herewith, were solicited to voting creditors prior to the filing of these Chapter 11 Cases, and the votes were tabulated prepetition. The Debtors are pleased to report that all voting classes have overwhelmingly voted to accept the Debtors' chapter 11 plan. As such, the Debtors anticipate a swift and value-maximizing chapter 11 process, and look forward to seeking confirmation of their plan within weeks of the filing of these cases, so that the Company can be out of bankruptcy just before the Thanksgiving holiday. Adhering to this timeline is critical, not only because it complies with the milestones set forth in the Restructuring Support Agreement, but also because PREIT's focus during the period from Thanksgiving to Christmas should squarely be on ensuring a safe, customer-focused retail shopping experience. Amidst all of the uncertainty to the mall-based retail industry posed by the acceleration of COVID-19 cases in recent weeks, it is incumbent on the Debtors—for the benefit of all of their stakeholders—that their retail properties are not incrementally impacted any further

by the overhang and uncertainty of their restructuring efforts during the upcoming holiday season.

## I.        PREIT's Corporate History and Business Operations

### A.    Overview

11.      PREIT, a Pennsylvania business trust founded in 1960 and one of the first REITs in the United States, has a primary investment focus on retail shopping malls located in the eastern half of the United States, primarily in the Mid-Atlantic region.  The Company is primarily engaged in the ownership, management, leasing, acquisition, redevelopment, and disposition of shopping malls.  PREIT is a fully integrated, self-managed and self-administered REIT that has elected to be treated as a REIT for federal income tax purposes.

12.      PREIT currently owns interests in 26 retail properties, which include 21 shopping malls and five other retail properties across nine states, canvassing a total of 20.3 million square feet.  PREIT and certain partnerships in which PREIT holds an interest own 15.9 million square feet at these properties (excluding space owned by anchors or third parties).

13.      In general, the Company's malls include tenants that are national or regional department stores, large format retailers or other anchors and a diverse mix of national, regional and local in-line stores offering apparel, shoes, eyewear, cards and gifts, jewelry, sporting goods, home furnishings and personal care items, among other things.  In recent years, the Company has increased the portion of its mall properties leased to non-traditional mall tenants.  Approximately 24% of its mall space is committed to non-traditional tenants offering services such as dining and entertainment, health and wellness, off-price retail and fast fashion.

14.      To enhance the experience for shoppers, most of the Company's malls have restaurants and/or food courts, and some of the malls have multi-screen movie theaters and other entertainment options, either as part of the mall or on outparcels around the perimeter of the mall

property.  As a result of social distancing requirements, reduced capacities and other measures to curb the spread of COVID-19, these tenants were some of the most impacted by the virus.  In addition, many of the malls have outparcels containing restaurants, banks or other stores.  The malls frequently serve as a central place for community, promotional and charitable events in their geographic trade areas.

### B.    Ownership Structure

15.    The Company holds interests in its portfolio of properties through its operating partnership, Debtor PREIT Associates, L.P. ("PREIT Associates"), a limited partnership formed under the laws of Delaware.  PREIT is the sole general partner of PREIT Associates and, as of June 30, 2020, held a 97.5% controlling interest in PREIT Associates.  It owns interests in its properties through various ownership structures, including partnerships and tenancy-in-common arrangements.  PREIT Associates' direct or indirect economic interest in the properties ranges from 25% or 50% (for eight partnership properties) up to 100%.

16.    The Company provides management, leasing and real estate development services through two of its subsidiaries: (i) non-Debtor PREIT Services, LLC ("PREIT Services"), which generally develops and manages properties that the Company consolidates for financial reporting purposes; and (ii) Debtor PREIT-RUBIN, Inc. ("PRI"), which generally develops and manages properties that the Company does not consolidate for financial reporting purposes, including properties owned by partnerships in which the Company owns an interest, and properties that are owned by third parties in which the Company does not have an interest.

17.    PREIT Services and PRI are consolidated for financial reporting purposes.  PRI is a taxable REIT subsidiary, as defined by federal tax laws, which means that it is able to offer additional services to tenants without jeopardizing the Company's continuing qualification as a REIT under federal tax law.

C.    **Retail Properties**

18.    As noted above, PREIT owns interests in 26 operating retail properties, including 21 shopping malls and five other retail properties.  In general, the Company owns the land underlying the properties in fee, or, in the case of properties held by partnerships with others, ownership of the partnership entity is in fee.  At certain properties, however, the underlying land is owned by third parties and leased to PREIT (or the relevant holding partnership) under long-term ground leases.  Under such leases, the building owner pays rent for the use of the land and is responsible for all costs and expenses related to the building and improvements.

19.    The following summary table includes relevant information (as of June 30, 2020) regarding the Company's retail properties, in which PREIT or one of its affiliates owns a 100% interest:

| Property/Location (Malls) | Anchors/Major Tenants |
| --- | --- |
| Capital City Mall, Camp Hill, PA | Macy's, JC Penney, Field & Stream, Dicks Sporting Goods, and Dave & Buster's |
| Cherry Hill Mall, Cherry Hill, NJ | Nordstrom, Macy's, JC Penney, and Apple |
| Cumberland Mall, Vineland, NJ | Best Buy, BJ's Wholesale Club, Boscov's, Burlington, Dick's Sporting Goods, Home Depot, and Marshalls |
| Dartmouth Mall, Dartmouth, MA | Macy's, JC Penney, and AMC |
| Exton Square Mall, Exton, PA | Boscov's, Macy's, Whole Foods and Round 1 |
| Francis Scott Key Mall, Frederick, MD | Macy's, Barnes & Noble, JC Penney, Sears and Value City Furniture |
| Jacksonville Mall, Jacksonville, NC | Belk, Barnes & Noble, JC Penney and Sears |
| Magnolia Mall, Florence, SC | Belk, Barnes & Noble, Best Buy, Dick's Sporting Goods, JC Penney, Burlington, HomeGoods, and Five Below |
| Moorestown Mall, Moorestown, NJ | Boscov's, Lord & Taylor, Regal Cinema RPX, Sears, HomeSense, Five Below, and Sierra Trading Post |
| Patrick Henry Mall, Newport News, VA | Macy's, Dick's Sporting Goods, Dillard's, and JC Penney |
| Plymouth Meeting Mall, Plymouth Meeting, PA | AMC Theater, Boscov's, Legoland Discovery Center, Whole Foods, and Burlington |
| The Mall at Prince Georges, Hyattsville, MD | Macy's, JC Penney, Marshalls, Ross Dress for Less, TJ Maxx, and Target |

| Springfield Town Center, Springfield, VA | Dick's Sporting Goods, JC Penney, Macy's, Nordstrom Rack, Regal Cinemas, and Target |
| Valley Mall, Hagerstown, MD | Belk, JC Penney, and Tilt |
| Valley View Mall, La Crosse, WI | Barnes & Noble and JC Penney |
| Viewmont Mall, Scranton, PA | Macy's, JC Penney, Dick's Sporting Goods/Field and Stream, and HomeGoods |
| Willow Grove Park, Willow Grove, PA | Apple, Bloomingdale's, Macy's, Nordstrom Rack, and Sears |
| Woodland Mall, Grand Rapids, MI | Apple, Barnes & Noble, JC Penney, Kohl's, Macy's, and Von Maur |

20.     The Company also owns retail space adjacent to Valley View Mall in La Crosse, Wisconsin, where it holds a 100% ownership interest.  Major tenants at this property include Chuck E. Cheese, Dick's Sporting Goods and Play It Again Sports.

21.     The Company's revenue consists primarily of fixed rental income, additional rent in the form of expense reimbursements, and percentage rent (*i.e.*, rent that is based on a percentage of its tenants' sales or a percentage of sales in excess of thresholds that are specified in the applicable leases) derived from its income producing properties.  The Company also receives income from its real estate partnership investments and from the management and leasing services PRI provides.  In year ending December 31, 2019, the Company generated approximately $336.8 million in revenue.

### D.    Employees and Supplemental Workforce

22.     In response to mall closures in the second quarter of 2020 relating to the ongoing COVID-19 pandemic, the Company furloughed a significant portion of its employee base and later made permanent headcount reductions.  Prior to these furloughs, the Company employed approximately 233 employees at its properties and corporate offices, but as of the Petition Date the Company—primarily through its non-Debtor affiliates—employs approximately 186 employees (collectively, the "Employees").  Of these Employees, two are employed by Debtor PREIT and the remaining 184 are employed by non-Debtor PREIT Services; however, because

payroll obligations are funded by non-Debtor affiliates, the Debtors are not seeking customary first day relief on account of payment of employee wages and compensation.  Of course, the Company's employees should see no disruption in their regular payroll and benefits as a result of the commencement of these Chapter 11 Cases.

23.    In addition to these Employees, the Debtors also indirectly employ thousands of personnel at their retail properties.  The Debtors outsource their housekeeping, maintenance and security functions located at each of their malls.  These personnel—while not employed directly by the Debtors—are a vital component of operating and maintaining their malls to enhance customer experience, and comprise thousands of individuals who rely upon the Company for continued employment.

## II.    The Company's Prepetition Organizational and Capital Structures

24.    The Debtors comprise 69 entities, including PREIT Associates, PRI and certain special purpose entities ("SPEs") associated with specific properties.  Non-Debtor affiliates include, among others, PREIT Services and those SPEs with property-level debt obligations.

25.    PREIT's interests in its portfolio properties are held by SPEs through various ownership structures, including partnerships and tenancy in common arrangements.  These SPEs are controlled by Debtor PREIT Associates, which PREIT holds a 97.5% controlling interest in as the sole general partner.

26.    Non-Debtor PREIT Services, which is wholly owned by Debtor PREIT Associates, holds interests in SPEs that develop and manage properties that are consolidated for financial reporting purpose.  Similarly, Debtor PRI, which is also wholly owned by Debtor PREIT Associates, holds interests in SPEs that develop and manage properties that are not consolidated for financial reporting.

27.     A chart depicting the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit C**.

28.     As of the Petition Date, the Debtors' funded debt obligations primarily include approximately (i) $668 million outstanding under the unsecured Revolver/TL Credit Agreement (as defined below), (ii) $245 million outstanding under the unsecured Seven-Year Term Loan Agreement (as defined below), (iii) $55 million outstanding under the secured Bridge Loan Credit Agreement (as defined below), and (iv) certain interest rate swap agreement obligations, all as further described below.   In addition, the non-Debtor affiliates also have additional mortgage loan obligations and lease obligations as further described below. The following table depicts the Debtors' prepetition capital structure, exclusive of accrued but unpaid interest and fees:

| FUNDED DEBT | | |
|---|---|---|
| **Funded Debt** | **Maturity** | **Outstanding Principal Amount as of Petition Date** |
| Prepetition Bridge Facility | October 31, 2020 | $55 million |
| Prepetition Revolver/TL Credit Facility | May 23, 2023 | $668 million |
| Prepetition Seven-Year Term Loan Facility | December 29, 2021 | $245 million |
| | **Total Funded Debt** | $968 million |
| **PREFERRED EQUITY** | | |
| **Preferred Equity**[3] | **Shares Outstanding** | **Approximate Liquidation Preference** |
| Series B Preferred Shares | 3,450,000 | $86,250,000 |
| Series C Preferred Shares | 6,900,000 | $172,500,000 |
| Series D Preferred Shares | 5,000,000 | $125,000,000 |

29.     In connection with the reorganization efforts contemplated in the Plan, the Debtor entities comprise all borrower, guarantor and pledgor entities under the Prepetition Credit

---

[3]     The figures provided are as of June 30, 2020.

Facilities.  As noted, however, the Debtors hold interests in numerous property-level entities that are not Debtors in these chapter 11 cases, many of which are subject to their own project-level debt facilities, ground leases, operating leases, and other contractual and non-contractual obligations.  As described in more detail in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System, (II) Authorizing Continued Intercompany Transfers Among Debtor and Non-Debtor Affiliates and (III) Granting Related Relief*, filed contemporaneously herewith, the operations of the Debtors and the non-Debtor affiliates are intimately interwoven.

30.     The Debtors and their non-Debtor affiliates rely on a seamless system of intercompany transfers for purposes of day-to-day operations.  Indeed, the operational synergies of the Debtors would be substantially diluted were the Debtors be unable to continue to transfer funds between Debtor and non-Debtor entities.  Payroll is one such example.  On a bi-weekly basis, PREIT Associates (a Debtor) transfers funds to the PREIT Services (a non-Debtor affiliate) to enable payroll distribution to the PREIT Group's 186 employees.  In addition, rental income generated by both Debtors and non-Debtor affiliates may ultimately flow upstream to bank accounts held in the name of Debtor PREIT Associates.

31.     Thus, on a post-petition basis, in order to among other things, meet the PREIT Group's operating needs and enable the PREIT Group to control and monitor the collection and disbursement of funds, ensure cash availability and liquidity, comply with the requirements of the Group's financing agreements, meet various state licensing requirements and reduce administrative expenses, the Debtors intend to continue to transfer funds to non-Debtor affiliates subject to the approved budget under the *Interim Order (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV)*

*Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Proposed Interim Cash Collateral Order"), and any subsequent orders entered by the Court.

### A.   Prepetition Unsecured Debt Obligations

#### 1.   Revolver/TL Credit Agreement

32.   On May 24, 2018, PREIT, PREIT Associates and PRI entered into that certain Amended and Restated Credit Agreement dated as of May 24, 2018 (as amended from time to time) (the "Revolver/TL Credit Agreement"), with Wells Fargo Bank, National Association, U.S. Bank National Association, Citizens Bank, N.A., and the other financial institutions party thereto (the "Revolver/TL Lenders"), pursuant to which the Company obtained an unsecured facility in the aggregate principal amount of $675 million, consisting of a $375 million revolving facility and a $300 million term loan facility. The maturity date of the revolving facility is May 23, 2022, subject to two six-month extensions at the Company's election, and the maturity date of the term loan facility is May 23, 2023.   As of the Petition Date, approximately $668 million was outstanding under the Revolver/TL Credit Agreement.

#### 2.   Seven-Year Term Loan Agreement

33.   On January 8, 2014, PREIT, PREIT Associates and PRI entered into that certain Seven-Year Term Loan Agreement dated January 8, 2014 (as amended from time to time) (the "Seven-Year Term Loan Agreement") with Wells Fargo Bank, National Association, Capital One, National Association and the financial institutions party thereto (the "Seven-Year TL Lenders") pursuant to which the Company obtained a term loan facility in the initial aggregate principal amount of $250 million.  As of the Petition Date, approximately $245 million remained outstanding under the Seven-Year Term Loan Agreement, which matures on December 29, 2021.

### B.    Bridge Loan Credit Agreement

34.    On August 11, 2020, PREIT, PREIT Associates and PRI entered into that certain Credit Agreement with Wells Fargo Bank, National Association and the financial institutions party thereto (the "Bridge Lenders") for a secured term loan facility allowing for initial borrowings up to $30 million (the "Bridge Loan Credit Agreement").    The Company's obligations under the Bridge Loan Credit Agreement are guaranteed by certain of PREIT's subsidiaries.    The Company's and guarantors' obligations under the Bridge Loan Credit Agreement and related guaranty are secured by, among other things, mortgages and deeds of trust on a portfolio of 12 of PREIT's subsidiaries' properties, including nine malls and three additional parcels.    The obligations are further secured by a pledge of substantially all of the personal property of the Company and the guarantors pursuant to a collateral agreement and a pledge of substantially all of the equity interests of the guarantors (subject to limited exceptions) pursuant to a pledge agreement.    In addition, on October 16, 2020, the Debtors executed an amendment to the Bridge Loan Credit Agreement, allowing for an additional borrowing of $25 million.    As of the Petition Date, approximately $55 million in principal amounts was owing under the Bridge Loan Credit Agreement.    While the entire amount of the Bridge Loan Agreement has been funded, the Debtors have not had access to $25 million, pending the commencement of these Chapter 11 Cases, and the consensual use of cash collateral.

### C.    Interest Rate Swap Agreements

35.    In the normal course of business, the Company is exposed to financial market risks, including interest rate risks, which it addresses through interest rate swap agreements (the "Specified Derivatives").    Aside from the Company's other hedges and swaps, certain of the Specified Derivatives were entered into by and between the Debtors on one side and the Consenting Lenders (or the non-Consenting Lenders, as applicable) as swap participants.    As of

September 30, 2020, the Swap Agreements have a weighted average base interest rate of 2.05% on a notional amount of $680 million, maturing on various dates through May 2023.  Prior to the Petition Date, the Specified Derivatives were net settled monthly.

36.     The Specified Derivatives permit, but do not require, a swap participant to terminate the Specified Derivative upon the occurrence of certain events of default, including the commencement of bankruptcy proceedings by the Debtors.  Pursuant to the Restructuring Support Agreement, the Consenting Lenders have agreed to either (i) reinstate their respective Specified Derivatives, or (ii) accept collateral with respect to the termination value of such Specified Derivatives.  However, swap participants that are not Consenting Lenders, including Capital One, National Association and U.S. Bank National Association, may elect to terminate the Specified Derivatives to which they are a party.  As of the Petition Date, the Debtors have not received notice of termination of any Specified Derivatives.

**D.     PPP Loan**

37.     In April 2020, PREIT Associates applied for and received an unsecured and potentially forgivable loan in the amount of $4.5 million (the "PPP Loan") under the Paycheck Protection Program of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  The PPP Loan matures on April 15, 2022 and accrues interest at a rate of 1.00% per annum.  Under the CARES Act, all or a portion of the PPP Loan is eligible for forgiveness to the extent the proceeds are used for qualifying purposes within a 24-week period following the loan funding.  The Debtors have used all of the funds to maintain payroll, lease, rent and utility payments and believe that the full amount of the PPP Loan will be forgiven.

### E.    The Company's Other Prepetition Obligations

#### 1.    Secured Property-Level Debt Obligations

38.    In addition to the above, certain non-Debtors have payment obligations under mortgage loans secured by eight consolidated properties that are due in installments over various terms extending to 2025.  Similarly, the Company also has payment obligations relating to unconsolidated properties, based on its respective partnership interests in the entities that own the unconsolidated properties.  The unconsolidated property mortgage loans are secured by seven unconsolidated properties and are due in installments over various terms extending to 2027.  The secured property-level debt obligations of the non-Debtor subsidiaries total approximately $896.5 million as of June 30, 2020.

#### 2.    Real Property Lease Obligations

39.    The Debtors have entered into numerous ground leases for portions of the land at Springfield Town Center and Plymouth Meeting Mall.  The Debtors have also entered into an office lease for its headquarters, as well as vehicle, solar panel and equipment leases, under which the Company is a lessee.  The initial terms of these agreements generally range from three to forty years, with certain agreements containing extension options for up to an additional sixty years.

#### 3.    Guaranty Obligations

##### (a)    Fashion District Philadelphia

40.    PREIT Associates has severally guaranteed 50% of the obligations of non-debtor PM Gallery LP ("PM Gallery"), a 50/50 joint venture with Macerich Company ("Macerich"), in connection with Fashion District Philadelphia, a new retail district located in Center City, Philadelphia, which opened in September 2019.  PREIT Associates provided a 50% guarantee of the underlying loan facility, which is in the approximately amount of $301 million and which

PM Gallery is a borrower (the "<u>Fashion District Facility</u>").  The Debtors' bankruptcy triggers an event of default under the Fashion District Facility; however, as described further below, prior to the Petition Date, the Debtors, PM Gallery, and certain lenders under the Fashion District Facility executed a term sheet to address the potential event of default and agreement to amend the Fashion District Facility, which is a condition precedent under the Debtors' Plan.

(b)    <b>Woodland Loan Agreement</b>

41.    The Company has entered into numerous ground leases for portions of the land at Springfield Town Center and Plymouth Meeting Mall.  PREIT Associates has guaranteed the obligations of non-debtor affiliate PR Woodland Limited Partnership ("<u>PR Woodland</u>") in relation to the $130 million Loan Agreement dated April 8, 2016 entered by and between PR Woodland, as borrower, U.S. Bank National Association, as administrative agent, and the lenders party thereto (as amended, modified, restated or reaffirmed from time to time, the "<u>Woodland Loan Agreement</u>").  The maximum liability of PREIT Associates under its guaranty of PR Woodland's obligations under the Woodland Loan Agreement is $32.5 million.

42.    PREIT Associates is additionally a guarantor under the recourse carve out guaranty agreement and environmental indemnification agreement entered into in connection with the Woodland Loan Agreement.  On October 27, 2020, US Bank, as administrative agent under the Woodland Loan Agreement, sent a notice of default and reservation of rights to PR Woodland on account of an alleged event of default occurring under the Unsecured Credit Agreements, which the Company disputes.

<b>F.    Equity Holders of PREIT</b>

<b>1.    Common Shares</b>

43.    PREIT's common shares of beneficial interest are publicly traded on the New York Stock Exchange under the trading symbol PEI.  As of the Petition Date, the Company's

voting stock was trading at approximately $0.50 per share.  As of June 30, 2020 there were approximately 79,460,000 PEI shares issued and outstanding.

### 2. Preferred Shares

44.     PREIT's preferred shares are also publicly traded on the New York Stock Exchange.  As of the Petition Date, PREIT had outstanding: (i) 3,450,000 7.375% Series B Cumulative Redeemable Perpetual Preferred Shares with an approximate liquidation preference of $86.3 million; (ii) 6,900,000 7.20% Series C Cumulative Redeemable Perpetual Preferred Shares with an approximate liquidation preference of $172.5 million; and (iii) 5,000,000 6.875% Series D Cumulative Redeemable Perpetual Preferred Shares with an approximate liquidation preference of $125 million.

### III. Circumstances Leading to the Commencement of these Chapter 11 Cases

### A. Market Conditions

45.     As described above, the Debtors are engaged in the ownership, management, leasing, acquisition, redevelopment, and disposition of shopping malls.  The retail sector—and shopping malls by extension, and in particular—has been hit especially hard by the COVID-19 pandemic due to mandatory store closures, travel restrictions, and unprecedented upheaval in the financial markets.  The Debtors' business and operations and those of many of their tenants have been materially and adversely impacted by the government-mandated travel restrictions, business closures and property shutdowns and the implementation of "social distancing" and certain other measures to prevent the further spread of the virus.

46.     In mid-March 2020, as a result of the COVID-19 pandemic, the Debtors began closing their enclosed shopping malls, which remained closed for the majority of the second quarter of 2020.  As of the Petition Date, all of the Debtors' malls have re-opened and are adhering to social distancing and sanitation and safety protocols designed to address the risks

posed by COVID-19, but many tenants are operating at reduced capacity or have not yet re-opened.  Worse yet, some tenants have entirely ceased business operations.  Local governments in some jurisdictions where the Debtors' malls are located are also contemplating or implementing new or renewed travel restrictions and business closures, which could result in additional closures of the Debtors' properties.

47.    As became common in the retail industry, during March and April of 2020, a significant number of tenants stopped paying rent.  Subsequently, the Debtors received requests from a large number of tenants relating to rent relief or deferral.  As a result of these rent abatements, as well COVID-19 mall closures, reduced sales revenues, and additional tenant bankruptcies, the Company experienced significant declines in year-over-year and quarter-over-quarter net operating income.  While third quarter collections improved over second quarter, the Debtors believe that future rent collections will continue to be materially below tenants' rent obligations as long as the lingering effects of COVID-19 affect the return of customers to malls and the financial strength of the tenants.

### B.    Prepetition Debt Obligations and Liquidity Constraints

48.    Prior to the Petition Date, and as a result of the operational challenges described above, the Debtors engaged with the Revolver/TL Lenders and Seven-Year Term Lenders during the second and third (and leading into the fourth) quarters of 2020 to manage their obligations under the Revolver/TL Credit Agreement and the Seven-Year Term Loan Agreement (together, the "Unsecured Credit Agreements").  On July 27, 2020, in anticipation of not meeting certain financial covenants, the Debtors entered into amendments to the Unsecured Credit Agreements to suspend certain debt covenants until September 30, 2020, which was subsequently extended until October 31, 2020 (the "Suspension Period").  Additionally, the minimum liquidity

requirements under the Seven-Year Term Loan Agreement were reduced during the Suspension Period.

### C.    Prepetition Restructuring Efforts

49.    In light of the challenges facing the retail environment generally, as well as the acute challenges posed by the COVID-19 pandemic specifically, the Company has been engaged in extensive, ongoing restructuring efforts with their lenders for the past seven months.  To that end, the Company retained and began working with PJT Partners, Inc. as its investment banker to explore out-of-court consensual restructuring options.  The Company subsequently retained DLA Piper LLP (US) as its restructuring counsel.

50.    As a result of the Debtors' prepetition restructuring initiatives, following extensive, arm's-length negotiations, the Debtors and the Consenting Lenders reached an agreement-in-principle on the restructuring transactions as reflected in the Plan.  As described above, on October 7, 2020, the Debtors and the Consenting Lenders entered into the Restructuring Support Agreement, which sets forth the material terms and conditions of the restructuring transaction to be implemented though the Plan (the "Restructuring Transaction"). The Plan and the Restructuring Support Agreement contemplate that the Restructuring Transaction will provide, *inter alia*, that the Company's outstanding prepetition debt obligations will be repaid, restructured or satisfied, including: (i) the Seven-Year Term Loan Agreement; (ii) the Revolver/TL Credit Agreement; (iii) the Bridge Loan Credit Agreement; and (iv) the Specified Derivatives.  Upon the effective date of the Plan, the capital structure of the reorganized Debtors will comprise an approximately (i) $150 million first lien senior secured revolving credit facility (the "Revolving Exit Facility"); (ii) $600 million first lien senior secured term loan facility (the "Senior Term Loan Facility" and together with the Revolving Exit Facility, the "Senior Facilities"); (iii) $313 million second lien secured term loan facility (the

"Second Lien Term Loan Facility" and together with the Senior Facilities, the "Secured Facilities"); (iv) reinstated Secured Property-Level Debt; (v) assumed (or reinstated, as the case may be) general unsecured debt payable in the ordinary course of business of the reorganized Company; (vi) reinstated Specified Derivatives, or, alternatively, incremental loans under the Second Lien Term Loan Facility equal to the termination value of the Specified Derivatives not held by Consenting Lenders and that do not elect to reinstate their swap transactions; and (viii) retained equity in reorganized PREIT.

51.     While the Company obtained broad consensus from its lender group to effectuate the Restructuring Transaction, unfortunately, it did not receive 100% approval which would have allowed the restructuring to be consummated on an out-of-court basis.  Rather, two lender parties—certain affiliates of Strategic Value Partners, LLC ("SVP"), and US Bank, N.A. ("US Bank")—were not parties to the Restructuring Support Agreement as of the Petition Date. Despite SVP and US Bank's unwillingness to support the Restructuring Support Agreement, the Consenting Lenders (*i.e.*, the lender parties to the Restructuring Support Agreement) comprise more than 80% of the aggregate indebtedness outstanding.

52.     While the Restructuring Support Agreement contemplated a chapter 11 filing on October 18, 2020, the Debtors actually commenced these Chapter 11 Cases two weeks later. During those two weeks, the Debtors and Wells Fargo Bank, National Association, in its capacity as agent under the Prepetition Credit Agreements and the Bridge Loan Credit Agreement ("Wells Fargo") held nearly round-the-clock negotiations to seek to obtain US Bank's and SVP's consensus to effectuate the Restructuring Transaction out of court.  These efforts focused primarily on two critical conditions precedent to effectuation of the Restructuring Transaction (whether in-court or out-of-court): (i) US Bank's agreement to resolution of a

satisfactory amendment to the Fashion District Facility (the "Fashion District Amendment"); and (ii) SVP's agreement to certain modifications to the draft exit facility credit agreements (the "Exit Facility Credit Agreements").

53.    Due to extensive efforts by the Debtors, Wells Fargo, PM Gallery, certain Consenting Lenders—including, principally, US Bank—and Macerich (as joint venture partner to PREIT Associates in PM Gallery), the Debtors ultimately proved successful in finalizing an agreed-upon amendment to the Fashion District Facility.  To that end, just hours prior to the commencement of these Chapter 11 Cases, PREIT, Macerich, and the Joint Lead Arrangers under the Fashion District Facility, comprising Wells Fargo, US Bank, JPMorgan Chase Bank, N.A., and PNC Bank, National Association executed a term sheet memorializing the terms of an acceptable Fashion District Amendment (the "Fashion District Term Sheet").  Not only was the entry into the Fashion District Term Sheet a monumental effort to address US Bank's reluctance to execute the Restructuring Support Agreement,[4] but it also provides a clear pathway to address one of the critical conditions precedent in the Plan.  By addressing these complex issues prior to the Petition Date, the Debtors have removed any potential for the multi-party negotiations surrounding the Fashion District Facility to delay—or worse yet, imperil—confirmation and consummation of the Plan.

54.    While the Fashion District Amendment negotiations were undoubtedly extensive and prolonged, they were dwarfed in comparison by the Debtors' attempts in negotiating a consensual resolution with SVP.  The negotiations with SVP—which only weeks prior to the

---

[4]    While US Bank was unable to execute the Restructuring Support Agreement prior to the Petition Date, in large part because the finalization and execution of the Fashion District Term Sheet occurred just hours before, US Bank voted to accept the Plan.  Although the Debtors will seek to obtain US Bank's signature on the Restructuring Support Agreement in the days that follow, its acceptance of the Plan and the Fashion District Facility all but ensures US Bank's support for the confirmation and consummation of the Debtors' Plan.  In the event that US Bank executes a joinder to the Restructuring Support Agreement, the Debtors would hold the support of approximately 95% of the aggregate holdings under the Prepetition Credit Facilities and 100% of the aggregate holdings under Bridge Loan Credit Agreement.

Petition Date purchased an approximately 5% piece of the debt at a steep discount—proved more difficult and, unfortunately, it appears that SVP will almost certainly seek to delay or derail the significant success embodied by the Restructuring Support Agreement.  Indeed, shortly after SVP's debt purchase, SVP proposed an alternative transaction (the "Alternative Proposal"), which would have provided 100% of the equity (subject to dilution) to the lenders under the Unsecured Credit Agreements (including SVP).   Unlike the Restructuring Transaction contemplated under the Restructuring Support Agreement, the Alternative Proposal would not have come with the broad consensus among the lenders under the Unsecured Credit Agreements. Accordingly, not only would it provide little or no recovery to general unsecured creditors and existing equity, but it could likely only be consummated after a cram-down fight with the Debtors' key lender group.  Nevertheless, the Company's board of trustees analyzed and considered the Alternative Proposal but, in light of the material execution risk and uncertainty (among other things) associated with pursuing a transaction that was not supported by its lender group, the Company ultimately determined that the Restructuring Transaction—as contemplated by the Restructuring Support Agreement—was in the best interests of the Company and allowed the Company to efficiently emerge from chapter 11.

55.     While the Company was unwilling to simply walk away from the consensual agreement with the Consenting Lenders, the Company, with the assistance of their advisors, spent the more than two weeks prior to the Petition Date seeking to obtain consensus with SVP on the terms of the Exit Facility Credit Agreements.  Not only was SVP provided considerably more information than any other Consenting Lender, but the Debtors and Wells Fargo provided SVP the ability to comment on the draft Exit Facility Credit Agreements, which such opportunity has not yet been afforded to any other Consenting Lender.  And, with the hopes of achieving

SVP's agreement, the Debtors proposed numerous and significant modifications to the Exit Facility Credit Agreements.  In the end, these negotiations reached a crossroads in the hours before the Petition Date, as SVP continued to press for certain rights that, in the view of the Company and the Consenting Lenders, would have transferred inappropriate and off-market consent rights to SVP in light of its relatively small debt position.

56.     Despite the lone hold-out, the level of consensus for this comprehensive reorganization reflects the substantial efforts undertaken by the Debtors and the parties to the Restructuring Support Agreement, and their belief in the Debtors' prospects as a reorganized enterprise.  Importantly, the Plan proposes to pay all Allowed General Unsecured Claims (as defined in the Plan) in full or reinstate such claims pursuant to section 1124 of the Bankruptcy Code.  In so doing, the Plan is intended to minimize any potential adverse effects to the Debtors' businesses, tenants, and trade partners as a result of the restructuring, and thus positioning the Debtors for a prompt emergence from bankruptcy.

### D.       Use of Cash Collateral

57.     In advance of the Petition Date, the Debtors, with the assistance of their advisors, closely analyzed their projected liquidity needs to adequately fund these Chapter 11 Cases.  In connection with the negotiations of the Restructuring Support Agreement, the Debtors sought to address these liquidity needs with their existing secured Bridge Lenders.  In doing so, the Restructuring Support Agreement contemplated that the Bridge Lenders would either provide debtor in possession financing, or otherwise extend additional funding prior to the Petition Date.  As noted above, the Debtors and certain of the Bridge Lenders agreed to amend the Bridge Loan Credit Agreement by funding an additional $25 million into a "cash collateral account" under the dominion of Wells Fargo.  Although this amount was funded on October 16, 2020, the Debtors

have not had access to these borrowings until commencement of these Chapter 11 Cases and approval of the agreed-upon use of cash collateral.

58.    In the weeks prior to the Petition Date, the Debtors and Wells Fargo negotiated the terms and conditions on which the Debtors may use cash collateral, comprising both the $25 million funding under the Bridge Loan Credit Agreement amendment, as well as ongoing revenues generated post-petition.  This agreement, memorialized in the Proposed Interim Cash Collateral Order, includes adequate protection granted to the Bridge Lenders in exchange for the consensual use of cash collateral.  The use of cash collateral is necessary to fund ongoing operations, the administration of these Chapter 11 Cases, and provide sufficient liquidity to consummate the transactions contemplated under the Plan.  The 13-week budget attached to the Proposed Interim Cash Collateral Order was prepared under my direction and with my input, and I believe it to be sufficient to effectuate the Company's objectives in these Chapter 11 Cases. Because the Debtors' Plan contemplates reinstatement of substantially all claims, the proposed cash collateral budget effectively provides for the Company's continuation of substantially all ordinary course payments notwithstanding the commencement of these Chapter 11 Cases.[5]

### E.    Prepetition Solicitation of the Plan

59.    On October 9, 2020, Prime Clerk, LLC ("Prime Clerk") the Debtors' proposed claims, noticing and solicitation agent, served on all holders of claims against and interests in the Debtors entitled to vote on the Plan the *Disclosure Statement Relating to the Joint Prepackaged Chapter 11 Plan of Reorganization of Pennsylvania Real Estate Investment Trust and Certain of*

---

[5]    In addition to other customary relief to pay certain pre-petition claims, the Debtors also filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Creditors and (II) Granting Related Relief*, which seeks authorization to pay ordinary course operational expenses.

*its Direct and Indirect Subsidiaries* (the "<u>Disclosure Statement</u>"), as well as ballots and other solicitation materials.

60.     The Plan provides for the complete restructuring of the Debtors' funded debt, while also providing for the payment in full or reinstatement of the Debtors' general unsecured claims, as well as permitting existing equity holders to retain their interests.  Further, the Plan provides for an additional $150 million in liquidity provided under the Revolving Exit Facility, whereas the existing principal amount of the Debtors' existing unsecured debt under the Seven-Year Term Loan Agreement and the Revolver/TL Credit Agreement, would effectively be converted from unsecured debt to secured facilities under the Senior Term Loan Facility and the Second Lien Term Loan Facility.  Indeed, only two classes are impaired under the Plan: "Specified Derivatives Claims" under Class 2, and "Unsecured Credit Facility Claims" under Class 5.  The former—which is made up of entirely of Consenting Lenders under the Restructuring Support Agreement—provides for an assumption of the Swap Agreements, as amended by an Omnibus Swap Amendment, and the latter receive its pro rata share of the Exit Facilities.

61.     The Debtors and the Consenting Lenders believe that the Restructuring Transaction implemented through the Plan, which has the support of the Debtors' largest stakeholders in these Chapter 11 Cases, is in the best interests of their stakeholders and the Debtors' estates, allowing for a swift emergence from chapter 11.  100% of Class 2 claims (Specified Derivative Claims) voted to accept the Plan, while 95% in amount of Class 5 claims (Unsecured Lender Claims)—with SVP as the lone holdout—voted to accept the Plan.  Given that Class 2 and Class 5 are the only impaired classes under the Plan, the Debtors' creditors overwhelmingly voted to accept the Plan.  In light of the overwhelming creditor support for the

Plan and current market conditions, the Debtors seek to efficiently administer these Chapter 11

Cases with the goal of confirming the Plan as expeditiously as possible, which will maximize

value and recoveries for the Debtors' stakeholders.

**F.     Proposed Chapter 11 Timeline**

62.     The Plan and the Restructuring Support Agreement contemplate that the Debtors'

employees and trade creditors will be paid in full in the ordinary course of business.   The

Debtors' business is continuing without interruption, and the Debtors expect to emerge from

these Chapter 11 Cases as soon as possible, prior to the crucial holiday season.   Indeed, the

Restructuring Support Agreement obligates the Debtors to consummate the Plan within 35 days

of the Petition Date.   Accordingly, the Debtors and the Consenting Lenders have proposed the

following timeline for the Chapter 11 Cases:

| Event | Date |
|---|---|
| Voting Record Date | October 7, 2020 |
| Commencement of Solicitation | October 9, 2020 |
| Voting Deadline | October 18, 2020, at 5:00 p.m. (Eastern Daylight Time) |
| Petition Date | November 1, 2020 |
| Combined Hearing Notice and Publication Notice | One business day after entry of the Proposed Order, or as soon as practicable thereafter |
| Plan Supplement Deadline | November 9, 2020 at 12:00 p.m. (Eastern Standard Time) or seven days prior to the Objection Deadline |
| Objection Deadline and Treatment Objection Deadline | November 16, 2020 at 12:00 p.m. (Eastern Standard Time) |
| Confirmation Order, Confirmation Brief and Reply Deadline | November 20, 2020 at 12:00 p.m. (Eastern Standard Time), or the deadline to file the agenda |
| Combined Hearing | November 24, 2020 at ____:__ _.m (Eastern Standard Time) |

## IV.     The Debtors' First Day Pleadings

63.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings in these Chapter 11 Cases seeking orders granting various forms of relief intended to facilitate the efficient administration of these Chapter 11 Cases.

64.     I have reviewed each of the First Day Pleadings listed on **Exhibit A**, and the facts set forth therein are true and correct to the best of my knowledge, information and belief, and are incorporated herein as if fully set forth in this Declaration.

65.     I believe that the relief requested in the First Day Pleadings is necessary to avoid immediate and irreparable harm and to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.

66.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief to the Debtors as is just and proper.

Dated:  November 1, 2020

/s/ Mario C. Ventresca, Jr.
Mario C. Ventresca, Jr.
Chief Financial Officer of PREIT